I'll call case number 2013 58 High Country Conservation v. United States Forest Service. Oh, there we have everyone. Before, before you start I do want to let Kelly's counsel know that it appears you're going to split your time and when you do that you do that at your own risk. We don't let you know and we are not going to stop you so that your co counsel can proceed so I just wanted to let you know that. Thank you. Robin Cooley for the Conservation Group Appellants. It's April 24 2020 mandate, this court did three things that are relevant for this appeal. The first is that it held that the North Fork exception to the Colorado roadless rule was unlawful. It also held that the appropriate remedy was vacature of the entire exception, and it remanded to the district court to enter the vacature order. Now, prior to this court's entry of the issuance of its mandate mountain coal represented to this court that if it vacated the exception it would not be able to construct roads in the roadless area. So do counsel's argument, determine the scope and depth of our ruling, or is that just something that counsel argued. I don't understand why that's even relevant. So, I think it's relevant because it goes to what all the parties understood the impact of vacature to be and more importantly, what the court understood the parties to actions. It's rather commonplace for counsel to say, your honors if you rule against us the sky will fall. That doesn't necessarily determine for us that the sky will fall or that everyone understood that to be the fact, you get my point. I do. And, and I think my point is just that mountain coal had made this representation, the Forest Service had also said in its NEPA documents which is representation to the public that if the, if the vacation, or the North Fork exception were vacated that there would be no road construction. But immediately after the court entered the mandate with no notice to the conservation groups and with the Forest Service's consent, mountain coal went out and bulldozed nearly a mile of road through the sunset roadless area in an apparent effort to get it done before the district court entered the mandate. And contrary to what it told this court in this briefing, mountain coal claims it has the legal right to construct additional roads, even now that the district court has entered that vacature order. So, because we've received a status report from mountain coal. Is this case moot. No, this case is not moot. We do have the status report from mountain coal but we haven't had the opportunity to brief that issue, but the case is not moot because we have no assurance that we aren't going to see more roads in the roadless area in the future. And so, this is a present they have no permit to enter and build anything or to remove a tree. Is that right. It is true that mountain coal has voluntarily relinquished its state permit that would authorize the road construction. Isn't that the thrust of your injunction that you're seeking. You're asking us to enjoin construction of roads and destruction will basically many movement of surface of earth basically in this area, and they're telling us, we're done there, we're not going to do that. So, again, this is a voluntary cessation of an activity and so we have to look at the burden that the Supreme Court set forth in friends of the earth versus laid law. And that is that it mountain didn't have they don't have a permit anymore. Yes, they voluntarily relinquished their permit voluntarily just pick it back up again. So, the, the state would have to reissue the permit, but under the standard set forth by the Supreme Court, we have to have assurances that this action is absolutely certain to not be unlikely to happen again. And so the state isn't even a party to this case and so this court can have no assurance that if mountain coal asked for those permits back if it determines it needs roads for panels three and four, that the state will not grant those permits, and ultimately that puts the state. When and if that happens, then you can bring additional litigation, I would assume. Possibly, we, we can appeal the, the state's order to a state agency, but essentially that sets up a situation where the state agency the mine land reclamation board is the interpreter of this courts. Vacature order and what the case law makes very clear is that this court is the authoritative interpreter of its own mandate. And is there any ambiguity in that mandate at all. We think the mandate is clear. And that wasn't that wasn't that the real issue. Yes, I think that is the real issue and, and when we talk about that. Sure. So, this court's mandate. Included feature of the entire exception, as I said, as well as. Well, let me start over this court's mandate vacated the entire North Fork exception area, and now mountain coal is arguing that essentially the, the vacature only applies outside of its lease modification areas. So, this is very similar to an argument that mountain coal made on the merits and lost and in fact the court in in resolving that held that the entire exception would be vacated. Now, additionally, all of mountain cold arguments, whether they're based on their leases or the statutory rights exemption or the mineral leasing act, ignore a fundamental principle of vacature. And that is that it's retroactive and it restores the status quo before the illegal action was adopted. So, in this case, vacature of the North Fork exception means that the courts treat the exception as if it never existed and therefore mountain coal does not have any road construction rights, because those rights were dependent on the North Fork exception and that exception is now gone. So, do you think rule 41 C has anything to do with this issue? Only in the sense that it makes this court's mandate the law of the land as of the date of its issuance. And so, mountain coals claim that it can can construct roads beyond that point is in clear violation of that mandate. I will say just going back to mountain coals claims that they that they still maintain rights to construct roads. They've asserted in this in their brief, but they haven't actually provided any briefing to this court on that issue. And as I explained, those, those claims are foreclosed by this court's mandate. Oh, you're saying that they're now are they've argued in their briefing, which preceded their giving up their permit that they could build roads. I mean, aren't we past that now? Because they have no permit to build roads. Correct, but they we what we have in the status report is also mountain coal statement that that if it does need roads in the future to mine panels, 3 and 4, that it will pursue those rights. And so I mountain coal just can't have it both ways, particularly if we look at the standard under friends of the earth. So, essentially, they're trying to leave the door open to pursuing road construction rights if they need them in the future, while at the same time arguing that this case is moot because it's absolutely clear they won't construct those roads. So, if mountain coal wants to move this case, then it needs to provide assurance to this court that it, it will not seek to construct roads in the future. Do we have a problem here with the complaint that we're dealing with that is it's an action. Against agencies, and we've just been spending some time discussing mountain coal. Do we have under the complaint that you filed any authority to even talk about or talk to mountain coal. Yes, here we have a scenario that are they violating the. This is not an APA claim what we have sought is an enforcement of the courts mandate and here we have a scenario that's that's squarely within the bounds of this case. Our mandate, and our judgment said we are reversing and remanding with directions to the district court to vacate the North Fork exception. Okay. So, when all of those words were on the page and sent out over the internet. Nothing was really final final final until the district court, in fact, took the action that we directed, is that not true. I would disagree with that statement in the sense that this court had deemed the North Fork exception illegal as of April 24 2020, which is the date of the mandate. So the courts holding in that respect was final. And so for mount coal to then turn around and rely and take, you know, an affirmative act to cause irreparable harm in direct in reliance on an illegal action is, is just fundamentally undermines the court's decision. And just turning back to the issue of whether this is this is within the scope of of this complaint. I would point the court to the international ladies garment workers case, which makes it very clear that this court is the authoritative interpreter of its own judgment and it has the power to construe that judgment and interpret that judgment. And importantly to compel compliance where it's necessary in light of that interpretation. So, this court has every right to say what it's vacature order means and and in fact, it is the right place to have this discussion as opposed to having it in front of a state agency. Mountain coal was a party by intervention. That is correct. If there are no further questions, I'll reserve the remainder of my time for rebuttal. Thank you, counsel. Good morning. This is Mike Drysdale representing Mountain Intervenor Mountain Coal Company. I'd like to start with the status report we filed and the current facts on the ground, because I do think those are the most important set of issues that were that are presently in place. And I would like to distinguish between the panel two road, which was the road that was constructed before the district court vacated North Fork exception and the potential future panel three and four roads, which have not no work has been done on those. And we don't expect any work will be done on those. As far as the panel to road go, why is that? That is because we don't believe that work will be needed and we have withdrawn our request our permit for those. As far as the panel to go road goes, that road has been abandoned and reclaimed the reclamation of the road was completed yesterday. The last bit of reclamation on the pad is going to be finished today. And the coal that those roads and those drill pads would have serviced has been fully mined. So as far as we're concerned, that is as moot as it can get. There's no circumstance where we would rebuild or seek to reuse those roads and pads. As for panels three and four, as I indicated, I don't see any likelihood that we would seek to build roads and pads there. And the only reason I say that I can't say with absolute certainty is because we're dealing with geology and we're dealing with underground gas. And one can never predict with certainty. But I want to emphasize because you so far concluded that there is not a methane gas problem there that would require venting. That's exactly right, Your Honor. That the pattern we have seen as we have moved south is such that we believe we can mine the coal that's underneath the Colorado roadless area without use of methane ventilation boreholes and therefore without use of roads. So we don't believe any disturbance will be necessary in that area. That's why we asked to withdraw the authorization that had existed before. But assuming that something happens and you change your mind about panel three and four roads, I guess I'm still a little perplexed by your statement in your status report saying that if you decide you need to build new roads for whatever reason, you would need you would need to prevail upon USFS to change its position that new roads in the roadless area are prohibited, following the June 15 2020 vector of the North Fork exception, as well as obtain a new permit revision. It's that part about change its position what what basis would you have for that. There has been a vacant or the North. As long as the North Fork exception has been vacated. Would you are you arguing you would have any basis to seek approval. Well, yes. So, so this gets back. So this gets back to the statutory rights to get a new a new need to would have to be complied with on a new rule. Well, again, there's to open up to what was formerly a roadless area. Right. So, well, there's two potential paths by week by which we could get authorization. One get any authorization unless the mandate was withdrawn or there was a new regulation adopted. Well, no, I think that's true of one path, but not the other path. One path would be a restoration of the North Fork exception. Nobody disputes that the North Fork exception is restored, then we would have the ability to build roads. Nobody would agree that the North Fork exception is in existence anymore. Also, we would also agree with that, Your Honor. But the question is, what we have is an intersection between lease rights and the North Fork exception. Well, your lease rights would give you no rights, whatever. Well, I mean, on the North Fork exception. Well, and that's where I think we disagree, Your Honor. I think that you can disagree all you want. Exactly. Exactly. Abandon. Well, the court invalidated the North Fork exception. That's all it did. It did not rule in any way what rights might or might not exist under leases with under that area. That's that's simply an open question. And certainly the Forest Service has taken the position that we can't do it. So we're not arguing about that right now. That's a purely hypothetical future issue. So, again, all I'm saying is, can you finish your explanation of how you think you could do it? Right. Certainly, Your Honor. So so the there is a separate exception which has not been challenged, remains in place. What's called the statutory rights exception. And that says that road building is allowed when necessary to effectuate rights conferred by statute. Our contention is that a minute, a lease issued under the Mineral Leasing Act, which nobody is disputing is valid, qualifies for that exception. This has never been adjudicated in any forum. It's never been an issue. So we don't know exactly what if if this if this question was called, what the Forest Service ultimately in an administrative action or subsequently in a court action would determine. And all we're saying is what we're reserving our rights on that. We're not saying that we have any imminent plans or expectation that we would ever assert this. There's many, many steps would have to occur. We're just not leaving. And you're saying before you could build more roads in this area, you would have to have the Forest Service's approval. Yes. Either the Forest Service's approval or we would have to file some sort of declaratory judgment action that would indicate that the Forest Service's position was incorrect. But some additional administrative or judicial action would be required before we could do any further road building or pad drilling in this area. That's why I don't I wouldn't necessarily use the word moot. I would say that there's not a live case or controversy on that issue. Would that still be an issue and would that still be possible, even if we did everything the appellants want us to do here? Would you still have that opportunity to? Well, I think that would depend upon the argument. Yeah, I think that would be a statutory exception. I think that would depend upon the scope of of the court's decision. Again, that's where we're getting so far to feel here. You know, in our view, the vacant the mandate was very clear. It instructed the district court to vacate the rule. The district court has done that. The mandate has been discharged. All we're arguing, everything we're arguing about now is what the rule means and what is allowed or not allowed after it's been vacated. And that's a whole separate set of issues. I mean, there's the tree cutting exception that the plaintiffs have invoked. That was never an issue at any point in the decade of litigation we've had over this rule in these lease modifications. So it sort of becomes a never ending grant of jurisdiction if this not if this case becomes not only has the rule been vacated or not, but becomes what is the full panoply of conduct that at any time can be undertaken now that the rule has been vacated? We would respectfully suggest that that is that is a matter for the administrative agencies in the first instance to deal with. And then if there's a disagreement, then further judicial action if necessary. So unless there are other questions, I will I will turn things over to Mr. Arbaugh. Thank you. Mr. I would just like to make maybe three or four points. First of all, this the status report and other circumstances make it clear that the the incident that brought us here is very, very unlikely to occur. Everyone agrees that the North Fork exception is is now vacated. So Mountain Coal's ability to build temporary roads under that exception is is gone. The Forest Service. Secondly, the Forest Service is on record now on page 33 of the government's brief that in its view, Mountain Coal can't build roads under this so-called statutory rights exception to the Colorado roadless rule. And as the status report acknowledges, before Mountain Coal could seek to build any roads, which it doesn't anticipate ever needing to, it would have to get the Forest Service to change its position on that point. Very importantly, we feel is the further fact also undisputed that as reflected in the status report on November two earlier this month, the Colorado agency, Colorado Division of Colorado DRMS has withdrawn Mountain Coal's authority to build any roads in this area on the lease modifications. And if and to follow up on that, if if for some reason in the unlikely event, it seems that Mountain Coal would change its mind, it would have to seek, try to regain its authority to build roads in this area from the Colorado state agency. And that's that involves a very public process, public notice, public process to regain that authority. And plaintiffs are very familiar with that process. In fact, as the record reflects here, they've previously participated in that process last summer when they were able to get the state agency to issue Mountain Coal an immediate cessation order. And as Mr. Drysdale alluded to, the road that Mountain Coal built in early June of last summer has now been reclaimed or is almost completely reclaimed. So we think that there's really not any likelihood that what brought us here will ever recur. And so the ultimate question for the court is, did the district court in its October 2, 2020 order, abuse its discretion in any way when it declined to afford the plaintiffs any further relief beyond the relief that it had already issued, which was to execute this court's mandate and on June 15, 2020, vacate the North Fork exception. And for the reasons stated in our brief, we don't think that the district court abused its discretion in any way in the order that's actually under review here. And so I would just sum up by saying that the district court's October 2, 2020 order should be affirmed. So you're saying when we vacate the exception, we buy that. We were not saying that further building, et cetera, in the area was forbidden. No, Your Honor, the the court certainly was not passing, for example, on Mr. Drysdale's statutory rights theory. The mandates very specifically determined what remedy the court was going to order. I think it's on beginning on page 12, 28 of the previous opinion, 951 F. Third, 12, 28, of course, as the statutory rights issue even before us. No, it was not, Your Honor. That's that's a very late blooming, you might say, issue that Mountain Coal has injected into the case only in its intervener brief here in the present appeal. But the court was quite clear in its prior decision that it was not vacating the North Fork exception itself. This court itself was not taking that step. It specifically assigned that. I thought it was pretty clear that that. The exception was vacated and the district court was ordered to enter an order. Your Honor, I think there was no action that the district court could take to not follow that mandate. It was going to be required. There was no action of any kind. The court directed the district court to vacate the North Fork exception. This court did not do that, did not issue that remedy itself. And so the district court duly followed the court's mandate on June 15, 2020. It issued an order. The mandate is you're assuming the mandate is only is only that last paragraph where we instruct the district court what to do. But we've said that the mandate includes not only those instructions to the district court, but the entire opinion that precedes it. That's that's correct. Your Honor doesn't seem to take that into account. I think it does, Your Honor, because the court's remedy discussion was quite thorough. And it said that we have three three options under our precedent for how she would how we should handle a situation like this. And we're picking option number two, which is to remand to the district court with instructions to vacate the North Fork exception. And that's exactly what the district court did. So. The in in our view, the the court, the district court correctly understood this court's mandate and executed it, and that really should be the end of the case. Well, when do you think the mandate was effective? Your Honor, the mandate, the mandate itself was effective when issued on April 24, 2020. But the question is, what did the mandate call for? It called for the vacation of and we did vacate. It called for that particular that particular exception. It called for the district court to vacate the exception, and that's what the district court did. So then the mandate is not effective when it's issued. It is, Your Honor, but the terms of the mandate determine, but there's nothing for the district court to do but file a mandate. There was nothing for the district court to do except to issue an order formally vacating the North Fork exception, and that's exactly what the district court did. So it's your position then that had the district court just stuck it in the drawer and not done anything, that nothing could have happened. If that had happened, Your Honor, probably the plaintiffs would have reminded the district court that it needed to take action on the mandate and filed a motion. And the motion, as it was in this case, would have been unopposed. And the court would have executed the mandate forthwith if it had neglected it, if it had forgotten about it. Your time is up, Mr. Rabin. Thank you. Thank you, counsel. Thank you. So the question that I'd like to address is whether there is anything for this court to do. And the answer is clearly yes, because we have heard from both of the federal defendants and from Mt. Cole that they do not believe that the district court's order entering vacature means that the Mt. Cole no longer has rights to construct roads under the North Fork exception. The North Fork exception was the only authority that Mt. Cole had to construct roads in the roadless area, and it is gone. What do we do with the leasing authority, the leasing modifications that we talked about in that same opinion? Correct. So the leasing modifications stand. The leases provide the right to mine coal, and they very clearly state that the coal mining under the leases is subject to the Colorado roadless rule. So Mt. Cole is mining coal under the leases currently. It just doesn't have the right to construct roads. And that issue, we think, is one that needs clarification from this court. Because, well, and let me explain why we're concerned about this. I mean, we heard from Mt. Cole that they don't see any likelihood that they're going to construct roads in the future. But that is not the standard for mootness. If they want to moot this case, then they need to make it clear that they will not seek to construct roads in the future. And the problem is that if Mt. Cole decides that it wants to construct roads in the future, we may be in the same scenario where construction happens before we can get a cessation order to stop it. And that's for two reasons. The Forest Service approvals that Mt. Cole bases its rights on are already complete. Those happened. So there isn't a subsequent federal action by the Forest Service to then approve the road construction. Mt. Cole is saying, we already have this right. We have to enter our leases. And so it's not clear to me how we're going to have another process. And then just with respect to the state, if they approve it through a minor revision, there is no automatic stay. So construction could occur during that time. Thank you.